

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-20-00060-CR
_____

TRUMAINE EVERET WASHINGTON, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 241st District Court
Smith County, Texas
Trial Court No. 241-1705-19

Before Morriss, C.J., Burgess and Stevens, JJ.
Memorandum Opinion by Justice Burgess

MEMORANDUM OPINION

The 241st Judicial District Court of Smith County, Texas, convicted Trumaine Everet Washington of aggravated assault with a deadly weapon and sentenced him to seventeen years' imprisonment. *See* TEX. PENAL CODE ANN. § 22.02(a)(2). On appeal, Washington challenges the legal sufficiency of the evidence to support the trial court's finding of guilt.[1] Because we find that sufficient evidence supported the trial court's determination that Washington threatened another with imminent bodily injury and used or exhibited a deadly weapon during the commission of the offense, we affirm the trial court's judgment.

I. **The Evidence at Trial**

Breanna Johnson testified that she was working as a stocker at Walmart on September 2, 2019, when Washington came into the store. While at the customer service desk, Johnson saw Washington speaking with Nicole Umbower, the customer service manager. Although she could not hear the conversation, Johnson said that Umbower's facial expressions revealed that she was upset. Umbower testified that Washington became angry when she told him that he could not return an expensive item from the electronics department without proof of purchase. She told Washington that he needed to wait for a manager and went on break after speaking with him.

Washington waited for several minutes without being helped. Johnson testified, and video surveillance showed, that Washington, who appeared impatient, stepped to the side and pulled out a gun from his backpack. Johnson said she was scared as Washington "put the clip

[1]Originally appealed to the Twelfth Court of Appeals, this case was transferred to this Court by the Texas Supreme Court pursuant to its docket equalization efforts. *See* TEX. GOV'T CODE ANN. § 73.001. We follow the precedent of the Twelfth Court of Appeals in deciding this case. *See* TEX. R. APP. P. 41.3.

in," "took a few steps towards the counter," said something out of her earshot, and walked towards the back of the store. The surveillance recording showed Washington loading the clip and walking away with the gun in his hand while leaving his backpack behind. Johnson, who was afraid for her life and the lives of others in the store, ran outside and called 9-1-1. She then stopped customers from going into the store because she believed Washington was going to shoot. Umbower did not see Washington's gun, but heard from other employees that he had shown a gun in the store and was making threats.

Eddie Pate, a Walmart manager in the sporting goods department, testified that Washington purchased a Bowie knife, asked him for a 200-pack of ammunition, and handed him the clip from his pistol. Pate said that, while it was unusual, other customers had brought him firearms when purchasing ammunition and that he did not feel threatened by Washington. However, Pate said he would not have sold ammunition to Washington had he known about the incident at the customer service department. He noticed that Washington was wearing a scarf around his neck in September.

Ivory Peavy, a Walmart asset protection associate, testified that he saw two nervous associates running toward the front door who reported that there was a man holding a non-holstered gun inside the store. Peavy started walking toward the back of the store as Washington was leaving the sporting goods department and saw Washington with a handgun and a Walmart bag in his hands. Peavy said that Washington was "gripping the gun like you would normally hold it," was wearing a ski mask that covered his face, and was walking toward the customer service department. Peavy made eye contact with Washington and watched as he paced in an

3

agitated manner around the customer service desk. Peavy was scared that Washington was going to shoot. Yet, Peavy said, and the surveillance recording confirmed, that Washington put his gun back into his backpack, which he retrieved from the unmanned customer service desk, zipped it up, and waited for a customer service associate for a while before leaving.

James Miles, an assistant manager who saw Washington with the gun, walked up to Washington after he had put the gun away and asked why he was so distressed. According to Miles, Washington told him to back up. Peavy said that Washington became upset when he heard Peavy on the telephone with police dispatchers, turned to her, and said, "I could go -- should go back in my backpack and I could shoot you and everybody in the store." Peavy, who was "100 percent sure he could do that," was scared for his life. In a signed statement, Peavy wrote that Washington was cursing loudly and said, "I'm going to shoot up the store." Peavy also said that Washington put his backpack on and "stood there for a couple of minutes" before exiting the building and leaving the parking lot in a white truck.[2]

Justin Kuehn, an officer with the Tyler Police Department (TPD), testified that Peavy pointed him to a vehicle leaving the parking lot as he approached the Walmart. Kuehn said that he made eye contact with Washington who "was obviously irate about something, with hand flailing." Although Kuehn activated his lights and siren, Washington kept driving until traffic forced him to stop. Kuehn testified that Washington did not comply with his commands and just kept screaming back at him. It was not until Washington "had officers on every . . . direction

---

[2]During cross-examination, Peavy admitted that he might have told officers that he did not feel that Washington's threat was imminent because the gun was inside of his backpack, but that he did not recall whether he made that statement.

4

surrounding his vehicle" that he decided to exit his vehicle. Kuehn testified that a semiautomatic pistol, the 200 rounds of ammunition, and a knife were recovered from the vehicle.[3]

Craig Shine, a detective with the TPD, testified that the way Washington carried a non-holstered gun "was calculated to alarm." According to Shine, Washington shouted at Umbower, "[T]his is going to be on you," after she could not help him with the return. Peavy testified that he was threatened the minute he saw Washington walking with the gun in the aisles. However, James Holt, a detective with the TPD who interviewed Peavy, testified that, while Peavy was threatened when Washington said he "could pull [his] gun out and shoot [Peavy] and everybody," Peavy told him that he did not feel that the threat was immediate because the gun was in the backpack at the time of the threat.

Washington testified in his defense. Washington said that he was trying to exchange a Google Nest camera and to purchase ammunition for his gun, which he believed he could carry into Walmart. He introduced a note from his doctor explaining that he was wearing a mask to cover the bottom half of his face because, according to the note, he was being treated for "painful large cystic acne" with "multiple antibiotics and creams that cause sensitivity to light and sun and needs to be covered by soft cloth to avoid pain and irritation."

Washington admitted that he became irritated with customer service because they were not helping him; decided to finish shopping after he waited several minutes without help; and

---

[3]Tristan Mota testified that she was a passenger in her husband's car when she noticed a man wearing a "wrap to like stop bleeding or conceal a wound" on his face "making gestures with his hands and his face as if he were angry" as he was driving his white truck. Mota said that the man reached into a backpack and pulled out "his [silver] gun . . . to where [she] could see it." Because the man was agitated, she contemplated calling the police but decided not to do so until the next day. Andy Erbaugh, a detective with the TPD, testified that he took Mota's call and later determined that Washington was driving the white truck.

5

took out the gun and magazine, loaded the magazine, and walked with the gun to the sporting goods department. Washington testified that the surveillance recording showed him removing the bullets from the magazine and placing them in his pocket before leaving the sporting goods department. According to Washington, he returned to the customer service department and placed the unloaded gun, ammunition, and knife in the backpack. Washington denied threatening Peavy. He said he was upset with the police officers who had tried to stop him because he had not done anything.

## II. The Evidence Is Legally Sufficient to Support the Trial Court's Findings

### A. Standard of Review

"In evaluating legal sufficiency, we review all the evidence in the light most favorable to the trial court's judgment to determine whether any rational jury could have found the essential elements of the offense beyond a reasonable doubt." *Williamson v. State*, 589 S.W.3d 292, 297 (Tex. App.—Texarkana 2019, pet. ref'd) (citing *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (plurality op.); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Hartsfield v. State*, 305 S.W.3d 859, 863 (Tex. App.—Texarkana 2010, pet. ref'd)). "Our rigorous [legal sufficiency] review focuses on the quality of the evidence presented." *Id.* (citing *Brooks*, 323 S.W.3d at 917–18 (Cochran, J., concurring)). "We examine legal sufficiency under the direction of the *Brooks* opinion, while giving deference to the responsibility of the jury 'to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.'" *Id.* (quoting *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007)

(citing *Jackson*, 443 U.S. at 318–19; *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007))).

"Legal sufficiency of the evidence is measured by the elements of the offense as defined by a hypothetically correct jury charge." *Id.* (quoting *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)). "The 'hypothetically correct' jury charge is 'one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried.'" *Id.* (quoting *Malik*, 953 S.W.2d at 240).

Here, the State alleged that Washington "did then and there intentionally and knowingly threaten Ivory Peavy with imminent bodily injury by holding a firearm and threatening to 'shoot up the store', [sic] and did then and there use or exhibit a deadly weapon, namely a firearm, during the commission of the assault." A person commits assault if he "intentionally or knowingly threatens another with imminent bodily injury." TEX. PENAL CODE ANN. § 22.01(a)(2). The assault becomes aggravated if the person "uses or exhibits a deadly weapon during the commission of the assault." TEX. PENAL CODE ANN. § 22.02(a)(2).

**B. Legally Sufficient Evidence Supports the Finding that Washington Threatened Another with Imminent Bodily Injury**

Peavy's testimony that Washington said, "I could go -- should go back in my backpack and I could shoot you and everybody in the store," was legally sufficient to establish that Washington threated Peavy with bodily injury. Peavy, who had previously seen Washington with the weapon, was "100 percent sure [Washington] could do that" and was scared for his life.

7

He told officers that Washington was "going to shoot up the store." However, Washington argues that, because the gun was in his backpack at the time of the threat, any threat of bodily injury was not imminent. We disagree.

In *Garcia v. State*, the Texas Court of Criminal Appeals stated, "Although the Texas Penal Code does not define 'imminent,' this Court has defined that term to mean 'ready to take place, near at hand, impending, hanging threateningly over one's head, menacingly near.'" *Garcia v. State*, 367 S.W.3d 683, 689 (Tex. Crim. App. 2012) (citing *Devine v. State*, 786 S.W.3d 268, 270 (Tex. Crim. App. 1989)). We have previously noted that "the concept of imminent includes near at hand, mediate rather than immediate, impending." *Tidwell v. State*, 187 S.W.3d 771, 775 (Tex. App.—Texarkana 2006, pet. struck).

Washington walked throughout the store with the gun in his hand, which Peavy spotted. The way Washington was holding the gun was calculated to and did alarm others. After placing it in his backpack, Washington paced back and forth at the customer service desk, and both Miles and Peavy noticed his agitation. Washington told Miles to back up, became upset when he heard Peavy speaking with dispatchers, and made a threat to Peavy that he "could" or "should" retrieve the gun from his backpack and could shoot Peavy and everyone in the store. "The gist of the offense of assault, as set out in Section 22.01(a)(2), is that one acts with intent to cause a reasonable apprehension of imminent bodily injury (though not necessarily with intent to inflict such harm.)" *Id.* Because the threat itself informed Peavy that the gun was in the backpack Washington was carrying and Peavy testified he was "100 percent sure" that Washington could carry out the threat, a rational jury could find, beyond a reasonable doubt, that Washington made

8

a threat of bodily injury that was "near at hand." *See Garcia*, 367 S.W.3d at 689; *Tidwell*, 187 S.W.3d at 775. As a result, we find the evidence legally sufficient to support Washington's conviction and overrule his first point of error.

### C. Legally Sufficient Evidence Supported the Deadly-Weapon Finding

Next, Washington argues that the deadly-weapon finding is not supported by sufficient evidence. Washington does not dispute that he carried a firearm in the Walmart or that a firearm is a deadly weapon per se. *See* TEX. PENAL CODE ANN. § 1.07(a)(17)(A). Instead, Washington argues that, because his gun was in the backpack at the time of his threat, he did not use or exhibit the firearm when he threatened Peavy with imminent bodily injury.

"[T]he term 'exhibited a deadly weapon' means that the weapon was consciously shown or displayed during the commission of the offense." *Plummer v. State*, 410 S.W.3d 855, 858 (Tex. Crim. App. 2013) (quoting *Patterson v. State*, 769 S.W.2d 938, 940–41 (Tex. Crim. App. 1989)). For purposes of this analysis, we will focus on whether the firearm was used. The Texas Court of Criminal Appeals has explained,

> "Use," as a verb, may mean a number of things. For example, "use" is defined as "to put into action or service: have recourse to or enjoyment of: employ . . . to carry out a purpose or action by means of; make instrumental to an end or process: apply to advantage: turn to account: utilize." In explicating the word the dictionary provides the following synonym: "employ, utilize, apply, avail: use is general and indicates putting to service of a thing, usu. for an intended or fit purpose . . . ."

*Safian v. State*, 543 S.W.3d 216, 223 (Tex. Crim. App. 2018) (quoting *Patterson*, 769 S.W.2d at 940–41; WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (1976), 796, 2523–24). As a result, "one can 'use' a weapon without exhibiting it, but not vice versa." *Plummer v. State*, 410

9

S.W.3d 855, 858 n.13 (Tex. Crim. App. 2013) (quoting *Coleman v. State*, 145 S.W.3d 649, 652 (Tex. Crim. App. 2004)).

The deterrence rationale of the deadly weapon finding "works only if the actor makes a conscious decision to 'use'. . . the weapon to assist in committing the felony." *Id.* at 864. "[U]sing a deadly weapon during the commission of a felony offense extend[s] to '*any employment of a deadly weapon, even its simple possession, if such possession facilitates the associated felony.*'" *Safian*, 543 S.W.3d at 223–24 (alteration in original) (quoting *Patterson*, 769 S.W.2d at 941); *see Plummer*, 410 S.W.3d at 865 ("[A] deadly-weapon finding for a felony offense must contain some facilitation connection between the weapon and the felony. The deadly weapon must, in some manner, help facilitate the commission of the felony.").

Here, we find that that trial court, as fact-finder, could determine beyond a reasonable doubt that "the deadly weapon was 'used' *in facilitating* the underlying crime." *McCain v. State*, 22 S.W.3d 497, 503 (Tex. Crim. App. 2000). Washington possessed and displayed the weapon throughout the store. When he assaulted Peavy, he made a conscious decision to use the weapon when referencing it during his threat. By stating that he "could" or "should" go into his backpack to retrieve the firearm and could shoot Peavy, he made Peavy aware of the weapon with the purpose of intimidating and threatening him. As a result, we find that legally sufficient evidence supported the trial court's finding that Washington used a firearm to facilitate the threat by assault and overrule his last point of error.

10

## III.    Conclusion

We affirm the trial court's judgment.

Ralph K. Burgess
Justice

Date Submitted:      October 26, 2020
Date Decided:        November 18, 2020

Do Not Publish